UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHARLOTTE TATE o/b/o A.P.,     )     CASE NO. 1:18CV1432
               )
        Plaintiff,     )
               )
        v.     )     JUDGE PATRICIA GAUGHAN
               )     Magistrate Judge George J. Limbert
               )
ANDREW M. SAUL[1],     )
Commissioner of Social Security     )
               )     REPORT AND RECOMMENDATION
               )     OF MAGISTRATE JUDGE
        Defendant.     )
               )

Charlotte Tate ("Plaintiff"), acting on behalf of A.P. ("Claimant"), her minor daughter, seeks judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying Claimant's application for Supplemental Security Income ("SSI"). ECF Dkt. #1. In her brief on the merits, filed on November 19, 2018, Plaintiff asserts that the administrative law judge ("ALJ") erred (1) in finding that Claimant's impairment did not meet or medically equal listing 112.05(B)(1)(a)(2)(a); and (2) in finding that Claimant only had a "marked limitation" in the domain of acquiring and using information under 20 C.F.R. § 416.926a(b)(1)(i). *See* ECF Dkt. #13. On February 19, 2019, Defendant filed a brief on the merits. ECF Dkt. #15. Plaintiff did not file a reply brief.

For the following reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and dismiss the instant case in its entirety with prejudice.

I.     **PROCEDURAL HISTORY**

---

[1]On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security, replacing acting Commissioner Nancy A. Berryhill.

Plaintiff filed an application for SSI on behalf of Claimant on January 29, 2016, alleging a disability onset date of March 1, 2015.  ECF Dkt. #10 ("Tr.") at 164.[2]  Plaintiff alleged that Claimant was disabled due to severe Attention Deficit Hyperactivity Disorder ("ADHD") and a learning disability. *Id.* at 215. The claim was denied initially and upon reconsideration. *Id.* at 127, 133. Following the denial of the claim, Plaintiff requested a hearing. *Id.* at 138. Accordingly, a hearing was held on September 8, 2017, with the ALJ, Claimant, and Plaintiff, with counsel, present. *Id*. at 59, 80. The ALJ heard testimony from Claimant and Plaintiff. *Id.* at 80-104.

On January 5, 2018, the ALJ issued a decision denying Plaintiff's claim. *Id.* at 33-54. Plaintiff requested review of the ALJ's decision, but on April 27, 2018, the Appeals Council denied Plaintiff's request for review. *Id.* at 1-4. The ALJ's decision therefore stands as the final decision.

On June 26, 2018, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1. Defendant filed an answer on September 6, 2018. ECF Dkt. #9. Plaintiff filed two motions for an extension of time to file a merits brief, both of which were granted. ECF Dkt. ## 11, 12. On November 19, 2018, Plaintiff filed a brief on the merits. ECF Dkt. #13. Subsequently, Defendant filed a motion for an extension of time to file a merits brief, which was granted. ECF Dkt. #14. On February 19, 2019, Defendant filed a brief on the merits. ECF Dkt. #15. Plaintiff did not file a reply brief.

## II.     STEPS TO DETERMINE WHETHER CHILD IS ENTITLED TO SSI

In order to qualify for childhood SSI benefits, a claimant must show that he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and that is expected to cause death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.906; 42 U.S.C.A. § 1382c(a)(3)(C)(i). An ALJ must proceed through the required sequential steps for evaluating

---

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather that the page numbers assigned by the CM/ECF system.  When the Transcript was filed the .PDF included an index, with the indexed pages differentiated from the numerical pages.  Accordingly, the page number assigned in the .PDF mirrors the page number printed on each page of the Transcript, rather than the page number assigned when the Transcript was filed in the CM/ECF system.

entitlement to childhood SSI. 20 C.F.R. § 416.924(a). The three-step procedure requires the ALJ to determine whether a child:

> (1) is performing substantial gainful activity;
>
> (2) has a "severe" impairment or combination of impairments; and
>
> (3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing").

20 C.F.R. § 416.924(a)-(d). In order to *meet* a listing, the child's impairment(s) must be substantiated by medical findings shown or described in the listing for that particular impairment. 20 C.F.R. § 416.925(d) (emphasis added). In order to *medically equal* a listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment. 20 C.F.R. § 416.926(a) (emphasis added). In order to *functionally equal* a listing, the child's impairment(s) must be of listing-level severity; *i.e.*, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one of the enumerated domains. 20 C.F.R. § 416.926a(a) (emphasis added). The Commissioner assesses all relevant factors, including:

> (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings;
>
> (2) how the child functions in school; and
>
> (3) how the child is affected by his medications or other treatment.

20 C.F.R. § 416.926a(a)(1)-(3). Further, in considering whether a child's impairment functionally equals the listings, the Commissioner begins by evaluating how a child functions on a daily basis and in all settings as compared to other children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b). The Commissioner considers how a child's functioning is affected during his activities at home, school and in his community in terms of six domains:

> (i) acquiring and using information;
>
> (ii) attending and completing tasks;
>
> (iii) interacting and relating with others;
>
> (iv) moving about and manipulating objects;

3

(v) caring for yourself; and,

(vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Lengthy definitions for "marked" and "extreme" are set out in § 416.926a(e). "Marked" limitation means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *See* 20 C.F.R. § 416.926a(e)(2)(i). "Extreme" limitation is the rating for the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean. *See* 20 C.F.R § 416.926a(e)(3)(i).

The ALJ will not rely solely on any test score, but instead will consider a claimant's test scores together with other information about the claimant's functioning, including reports of classroom performance and observations of school personnel and others. *See* 20 C.F.R § 416.926a(e)(4)(i)-(ii). This is consistent with the "whole child" approach for determining whether a child's impairment functionally equals the listings. *See, e.g.,* S.S.R. 09-1P, 2009 WL 396031 (Feb. 17, 2009); S.S.R. 09-2P, 2009 WL 396032 (Feb. 18, 2009). The "whole child" approach is a technique for determining functional equivalence by accounting for all of the effects of a child's impairments singly and in combination–the interactive and cumulative effects of the impairments–because it starts with a consideration of actual functioning in all settings. S.S.R. 09-1P, at *2. The particular effects of a child's impairment(s) could affect the child's activities in any and all of the domains. *Id.* at *3. S.S.R. 09-1P illustrates how a single impairment can affect more than one domain with the example of ADHD and how it can affect several domains at once, including Acquiring and Using Information. *Id.* at *4-5.

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to

independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id.*

If the child's impairment meets, medically equals, or functionally equals the listing, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

### III.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

### IV.    RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

#### A.    Medical Evidence and Assessments

Claimant was born on December 1, 2007, making her seven years old on the onset date of her alleged disability. *See* Tr. at 164. Due to concerns regarding classroom performance, Claimant's teacher, Mrs. Coan, referred Claimant for speech and language testing and, later, to the school

psychologist, Kelly Hickey, around September 2014. *Id.* at 238, 300. In addition, Claimant's medical records refer to a prior ADHD diagnosis. *See id.* at 238, 312, 319.

Speech and language pathologist Kristen Kodish evaluated Claimant on October 15, 2014. *Id.* at 300. During this evaluation, Claimant was administered the Test of Language Development - Primary 3rd Edition ("TOLD - P:3"). All of Claimant's quotient scores fell below the average range for students her age. *Id.* at 302. Kodish remarked that the results of the TOLD - P:3 suggest that Claimant demonstrated receptive and expressive language skills below the average level for children her age, but that the results should be viewed with caution because Claimant demonstrated a variety of language skills outside the context of a standardized test and, therefore, are likely an underestimation of her true performance in those areas. *Id.* at 303.

In November and December 2014, Kelly Hickey administered the WJ-III, the WISC-IV, and the DIBELS tests to Claimant. *Id.* at 238-41. Claimant's test results for various academic areas were described as "Low," "Very Low," "Borderline," and "Extremely Low." *See id.* at 240. Claimant's WISC-IV scores in the area of Verbal Comprehension (79) and Perceptual Reasoning (73) were described as Borderline, while Working Memory (59), Processing Speed (68) and Full Scale IQ (64) were described as Extremely Low. *Id.* at 239-40. Hickey noted that Claimant's test performance and levels of attention/concentration varied significantly and suggested viewing her test results with some caution in terms of diagnoses and scholastic classification. *Id.* at 240.

On March 25, 2015, psychologist Dr. Sandra K. Sommers evaluated Claimant due to the school's concerns that Claimant was having significant problems with not staying on task and not being able to comprehend and retain basic grade level material. *Id.* at 312. Claimant was administered the WISC-V test for which Claimant received Low Average, Borderline, and Deficit scores. *Id.* at 314-16. Claimant was also administered the WIAT-III test for which she received a range of scores in various areas, all of which were below the mean score. *Id.* at 316-17. Claimant also scored well below the mean in the Berry-Buktenica Developmental Test of Visual-Motor Integration ("VMI"). *Id.* at 317. Claimant's teacher and mother also raised clinical concerns with attention and thought problems. *See id.* at 318. Dr. Sommers noted that the results of the intelligence testing indicate that Claimant's functioning fell within the "Extremely Low - Low Average" range

6

of intellectual functioning, needs repetition to learn new skills, struggles with auditory learning, and ultimately opined that Claimant has a Cognitive Learning Delay. *Id.* With regard to academics, Dr. Sommers found that Claimant's reading, math, written expression, and receptive/expressive language skills all were at a Kindergarten level, even though at this time Claimant was in the first grade. *Id.* at 312, 318-19. Claimant also showed only minimal progress in spite of the implemented interventions. *Id.* at 318-19. Dr. Sommers found Claimant's visual motor coordination was of significant concern because she was approximately three years behind her expected age range. *Id.* at 319. Dr. Sommers also found that Claimant's symptoms meet the guidelines for a diagnosis of ADHD - Combined Type (Hyperactive, Impulsive, Inattentive), whereas her previous diagnosis was for ADHD - Inattentive Type. *Id.* at 319-20. In addition, Dr. Sommers diagnosed Claimant with Developmental Learning Delay in Reading, Written Expression, and Math (DSM-V: 315.9). *Id.* at 320. Dr. Sommers recommended for the school to develop an Individualized Educational Plan ("IEP") to implement accommodations to address Claimant's specific learning disabilities, and she recommended for Claimant's parents to work with her pediatrician to determine what medical interventions would be most successful with increasing her sustained attention by addressing her ADHD. *Id.*

On April 9, 2015, Claimant visited pediatrician Dr. Kimberly R. Giuliano, who prescribed Adderall XR to address her ADHD. *Id.* at 394. Claimant was subsequently switched to a different medication, Focalin, because she was not benefitting from the Adderall, which made her emotional. *Id.* at 389, 392. Plaintiff stated that the Focalin appeared to slightly improve Claimant's condition. *Id.* at 389.

On May 27, 2015, Claimant followed up with Ms. Kodish who noted that she showed great improvement in her focus and work, needed fewer cues to answer questions, and needed only minor repetitions when repeating directions. *Id.* at 298. She also noted that Claimant improved in her ability to immediately recall a series of words, but still has difficulty remembering all words after a delay. *Id.*

Claimant's second grade teacher, Monica Marolt, submitted a progress report on September 9, 2015 in which she noted that Claimant was unable to follow 2- or 3-step instructions and needed much repetition. *Id.* at 323-24.

On September 14, 2015, Claimant went to occupational physical therapy ("OT") for an evaluation after being referred due to concerns with visual motor processing. *Id.* at 329-30. Therapist Angela Rice noted in her medical history that Claimant has asthma and a PE tube placement due to frequent ear infections in November 2008, but was otherwise healthy. *Id.* at 329. Claimant demonstrated visual motor skills below typical ranges and delays with self-help skills. *Id.* at 330. The results of a DTVP-2 indicated that Claimant's difficulty processing visual input was likely interfering with her ability to participate in typical, age appropriate activities such as writing, catching, throwing, and participation in activities of daily living ("ADLs"). *Id.* Rice recommended weekly OT sessions. *Id.* at 331. Claimant continued going to OT sessions throughout 2015. *Id.* at 362-79. Plaintiff reported during an OT session on September 29, 2015 that she did not give Claimant her ADHD medication that morning, and Plaintiff was subsequently counseled on the benefits of providing Claimant with a consistent dosage. *Id.* at 376-77.

Claimant's school conducted an Evaluation Team Report ("ETR") on October 6, 2015. *Id.* at 336. Subsequently, the school implemented an IEP to begin on January 12, 2016. *Id.* at 343. The IEP included: minor adjustment of preferential seating; modified assignments/test/quizzes as needed; organizational assistance as needed; break assignments/tests/projects into manageable units; clarify/repeats directions as needed; adjusted grading scale as needed; basic skills/learning resources services as needed; small group setting; multiple opportunities for repeated practice; and other accommodations. *Id.* at 291, 351-52.

On October 7 and 15, 2015, Kristen Kodish evaluated Claimant and administered OWLS-II and CELF-4 tests. *Id.* at 455-59. The results indicated that Claimant's receptive and expressive language skills fell below average for children her age. *Id.* at 458. She also demonstrated a specific pattern of errors related to her understanding and use of prepositions and tenses. *Id.* Testing further indicated that she had significantly below average phonological skills and a delayed ability to rapidly and automatically name shapes and color, as well as familiar sequences. *Id.*

On November 12, 2015, Claimant presented to Dr. Giuliano complaining the Focalin XR 5 mg was not helping. *Id.* at 369; *see also id.* at 369, 371, 373 (Plaintiff reported concerns about efficacy of Claimant's ADHD medication during October and November 2015 OT sessions). She had moderate symptoms including problems focusing, forgetfulness, organizational problems and poor school performance. *Id.* at 369. Dr. Giuliano subsequently increased her dose of Focalin to 10 mg. *Id.* at 370.

Claimant continued attending OT sessions 2016 until April of that year to continue to focus on fine motor skills, visual motor skills, sensory processing, visual memory tasks, and auditory memory. *Id.* at 362-64, 429-42. During the January 19, 2016 OT visit, Plaintiff requested to discontinue speech services for Claimant. *Id.* at 363, 442.

On February 3, 2016, Claimant visited pediatrician Haley Masterson, M.D. *Id.* at 401. Her progress notes indicated that Claimant's higher dose of Focalin since November 2015 has helped her symptoms, and her grades improved to being "satisfactory." *Id.*

On February 28, 2016, Claimant's second grade teacher, Monica Marolt, filled out a questionnaire about Claimant's overall functioning. *Id.* at 409, 412. Marolt noted that Claimant has problems functioning in the domain of attending and completing tasks, with her most serious problems in the activities of carrying out multi-step instructions, completing assignments, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time. *Id.* at 410. Marolt noted that she observed no problems in the domain of moving about and manipulating objects. *Id.* at 411. During February of 2016, Claimant took the Iowa Assessments standardized test and achieved scores in the below average range for all subjects tested. *Id.* at 416-17.

In March 2016, state agency reviewing consultants at the initial level[3] opined that Claimant's impairment(s) is severe, but does not meet, medically equal, or functionally equal the listings based on example. *Id.* at 105, 109. The consultants also evaluated the six domains, finding marked limitation in the domain of Acquiring and Using Information, less than marked limitation in the domain of Attending and Completing Tasks, and no limitation in the domains of Interacting and

---

[3] The state agency reviewing consultants at the initial level included psychologist Carl Tishler, Ph.D., speech-language pathologist Lisa Lynch, M.A., and pediatrician Milford Schwartz, M.D. Tr. at 110-11.

Relating With Others, Moving About and Manipulation of Objects, Caring for Yourself, and Health and Physical Well-Being. *Id.* at 109-10. Specifically in the domain of Acquiring and Using Information, the consultants noted that Claimant's overall language score fell 2 standard deviations below the mean. *Id.* at 109. These findings were affirmed at the reconsideration level[4] in June 2016. *Id.* at 115, 120-22.

On August 22, 2016, psychologist Dr. Sandra K. Sommers, Ph.D. completed a questionnaire on medical and functional equivalence. *Id.* at 450, 453. Dr. Sommers opined that Claimant would have extreme limitation in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Moving About and Manipulating Objects, marked limitation in the domains of Caring for Self and Health and Physical Well-Being, and moderate limitation in the domain of Interacting and Relating with Others. *Id.* at 450-52. The form defined "marked" limitation as one that "[i]nterferes seriously with the child's ability to function independently, appropriately, and effectively in an age appropriate manner. Testing is usually two standard deviations below the norm." *Id.* at 450. The form defined "extreme" limitation as "[n]o meaningful function in a given area. Testing is usually three standard deviations below the norm." *Id.*

On October 11, 2016, Claimant underwent an OT evaluation with Angela Rice. *Id.* at 489. Claimant was administered the Developmental Test of Visual Perception ("DTVP-2"), which assesses visual perception and visual-motor integration skills in children aged 4 years to 10 years and 11 months. *Id.* at 490. Rice's findings stated that Claimant has shown significant improvements in visual processing since her original evaluation from about one year prior on September 14, 2015. *Id.* at 491. Rice also noted that although her scores improved, Claimant's "overall visual perception quotient continues to be below average while visual motor integration is average and motor free visual perception is 'poor.'" *Id.* Ms. Rice stated that Claimant would continue to benefit from OT services to improve functional performance. *Id.* at 494. Claimant continued going to OT from January 2017 through May 2017. *See id.* at 509-26.

---

[4]The state agency reviewing consultants at the reconsideration level included psychologist David Dietz, Ph.D., speech-language pathologist Marissa Hastie, and pediatrician Frank Stroebel, M.D. Tr. at 122.

On February 9, 2017, Claimant's third grade teacher Elaine Sowa completed a School Activities Questionnaire in which she stated that Claimant's "functioning level is well below third grade." *Id.* at 271-72. She also made multiple notes that Claimant needs one-on-one help in certain areas. *Id.* at 271. Ms. Sowa further noted that Claimant did not exhibit behavior issues, exhibited age-appropriate hygiene and self-care, has excellent attendance, and participates with peers in sports, games, and other extracurricular activities. *Id.* at 272.

On February 23, 2017, Claimant underwent a referred neurological evaluation with neuropsychologist Dr. Kelly Wadeson, Ph.D., to determine her cognitive status and to obtain recommendations for additional beneficial interventions. *Id.* at 482. Despite showing gains and meeting therapy goals, Claimant continued to struggle at school, particularly in reading. *Id.* Dr. Wadeson extensively reported on Claimant's relevant medical history starting from her birth. *Id.* at 482-84. Dr. Wadeson noted that Claimant was most recently prescribed Focalin, but it seemed to wear off and was of questionable effectiveness. *Id.* at 484. She also noted that Claimant had not taken the medication for many months. *Id.* Dr. Wadeson observed that Claimant tended to speak very little and seemed to have a limited vocabulary, her comprehension was impaired on some tasks, and she tended to make the same errors repeatedly. *Id.* She also observed that Claimant was distractible and impulsive on some tasks but was able to complete the full battery with good frustration tolerance. *Id.* at 484-85.

On measures of behavioral and psychological functioning, Dr. Wadeson noted that Claimant endorsed clinically significant concerns with inattention, hyperactivity and impulsivity, learning problems, and executive functioning. *Id.* at 485. Claimant's Full Scale IQ score was in the extremely low range, her ability to define words was in the mildly impaired range, and her measure of visual-spatial problem solving and reasoning was in the moderately to severely impaired range. *Id.* at 485-86.

Dr. Wadeson administered two achievement tests to Claimant designed for children slightly younger. *Id.* at 485. On the Bracken School Readiness Assessment-Third Edition, Claimant's average score was equivalent to children of about 6 years of age, whereas Claimant at this time was 9 years old. *Id.* at 482, 484-85. On the YCAT, Claimant achieved an Early Achievement Composite

in the mildly to moderately impaired range. *Id.* at 485. Dr. Wadeson summarized her findings and found that Claimant was functioning at an age-equivalent of around 6 years. *Id.* at 486. This in conjunction with Plaintiff's reports confirmed to Dr. Wadeson that there has been very little to no progress academically. *Id.*

Dr. Wadeson further found that Claimant made some gains in terms of visual-spatial and fine motor skills. *Id.* However, Claimant had impairments in terms of letter/phonetic fluency, executive function, and memory for visually presented information. *Id.* Claimant reportedly performed better when the information was presented in a story format, and she actually had low average delayed free recall and average recognition. *Id.*

Dr. Wadeson opined that the results of this evaluation were highly consistent with previous assessments and continue to support Claimant's eligibility for special education services. *Id.* She recommended that Claimant receive individualized instructional assistance at school, have accommodations and adjustments in expectations, and be directed into classes in which she can experience some success. *Id.* Since Claimant continued struggling and was not progressing, Dr. Wadeson found that the general classroom environment was not beneficial or appropriate for her needs. *Id.* She recommended that Claimant receive as much one-on-one and small group instruction as possible in all academic subjects. *Id.* at 287. She also recommended that Claimant would do best in a structured educational environment with direct, step-by-step teaching methods involving controlled practice and close monitoring. *Id.*

On April 26, 2017, Plaintiff and Claimant visited treating pediatrician Dr. Diard for the purpose of restarting Claimant on Focalin but a longer acting form. *Id.* at 460. Dr. Diard initiated a trial of Concerta, another ADHD medication. *Id.* at 461. Dr. Diard also noted that Claimant will attend a school starting in the fall to have an IEP, as well as to get speech and OT, as per Dr. Sommers' prior recommendation. *Id.* at 460.

### B.    Hearing Testimony

At the September 8, 2017 hearing before the ALJ, the ALJ examined Claimant and then Plaintiff. Plaintiff testified that Claimant started taking her ADHD medication in May of 2017 and

12

stopped taking it after school ended on June 2. Tr. at 94-95. Plaintiff testified that she did not give Claimant her ADHD medicine at all during the summer because she did not like the side effects. *Id.*

Plaintiff further testified that Claimant was participating in OT and was getting speech and language therapy as well. *Id.* at 96. She stated that overall, the OT has been helpful to Claimant. She noted that although Claimant was nine years old and in the Fourth grade, she was on a Kindergarten/First grade level, and she does not retain information well at all. *Id.* Plaintiff also stated that Claimant failed the Ohio Graduation Test ("OGT"), but because Claimant has an IEP, her school allowed her to progress to the Fourth grade. *Id.*

Regarding behavior, Plaintiff testified that Claimant gets along well with her teachers, is somewhat shy with other students, and overall does not have any behavioral issues at school. *Id.* at 97. Plaintiff testified that she helps Claimant with her homework because Claimant cannot do her homework alone. *Id.* at 98. She stated that Claimant cannot read, cannot add, and does not know all her letters. *Id.* Plaintiff also stated that she has to help Claimant bathe. *Id.* at 98-99, 103.

Upon examination by her attorney, Plaintiff reaffirmed what her attorney mentioned during her opening statement, which was that Claimant was scheduled to have testing done to see whether she was on the autism spectrum. *Id.* at 92, 99.

Plaintiff also testified that Claimant has not been able to retain information, despite the accommodations and tutoring she receives. *Id.* at 100. She stated Claimant also has memory and organizational problems. *Id.* at 102.

## V.  SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

After stating the applicable law in his decision, the ALJ indicated that Claimant was a school-age child on January 12, 2016, on the date that the application for SSI was filed[5], and was still a school-age child at the time of his decision. Tr. at 39. The ALJ found that Claimant had not engaged in substantial gainful activity since the application date. *Id.* The ALJ concluded that Claimant has

---

[5] The application for SSI benefits was actually filed on January 29, 2016, but the ALJ's determination regarding Claimant's age was still accurate. *See* Tr. at 164. School-age children are between the ages of 6 and 12. 20 C.F.R. § 416.926a(g)(2)(iv).

the following impairments: Attention Deficit Hyperactivity Disorder ("ADHD"); speech and language impairments; and borderline intellectual functioning. *Id.* However, the ALJ found that these impairments did not meet or medically equal the severity of a listed impairment. *Id.* The ALJ specifically identified listings 111.09 (communication impairment), listing 112.05 (intellectual disorder), listing 112.02 (neurocognitive disorders), and 112.11 (neurodevelopmental disorders). Id. at 40-41. The ALJ also found that Claimant did not have an impairment or combination of impairments that functionally equals the severity of the listings and considered each of the six domains. *Id.* at 41, 47-53. The ALJ found that Claimant: (1) has marked limitation in acquiring and using information; (2) less than marked limitation in attending and completing tasks; (3) no limitation in interacting and relating with others; (4) no limitation in moving about and manipulating objects; (5) no limitation in the ability to care for herself; and (6) no limitation in health and physical well-being. *Id.* at 47-53. Therefore, the ALJ concluded Claimant was not disabled. *Id.* at 53.

## VI.    ANALYSIS

Plaintiff contends that the ALJ erred in denying SSI benefits by finding only a "marked," instead of an "extreme," limitation in the domain of Acquiring and Using Information primarily because he only gave "little weight" to Dr. Sandra Sommers' opinion and "did not accept" the opinion of Dr. Kelly Wadeson. ECF Dkt. #13 at 10, 13.

Throughout her brief on the merits, Plaintiff makes conclusory statements that Claimant meets, medically equals, or has the functional equivalent of listing 112.05(B)(1)(a)(2)(a). *See* ECF Dkt. #13 at 11-13, 17. However, Plaintiff only makes the substantive argument that Claimant's impairment functionally equals the listing and actually states that "[t]he issue in this case rests solely on the degree of limitation in the domain of acquiring and using information." *Id.* at 17; *see id.* at 13-17. The burden to show that Claimant meets or medically equals an impairment in the listings is on the Plaintiff. *See Evans v. Sec. of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987); *Todd v. Astrue*, 2012 WL 2576435, *9 (N.D. Ohio 2012) (report and recommendation adopted *Todd v. Astrue*, 2012 WL 2576282 (N.D. Ohio 2012)). Plaintiff's conclusory statements without any supporting argument are deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.

14

1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal citations omitted); *Thacker v. Soc. Sec. Admin.*, 93 Fed. Appx. 725, 728 (6th Cir. 2004) ("When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency.").

As to whether the Claimant's impairments meet or medically equal listing 112.05(B)(1)(a)(2)(a), the undersigned recommends that the Court find that Plaintiff fails to meet her burden and has waived any challenge to the ALJ's finding that Plaintiff's impairment(s) did not meet or medically equal listing 112.05(B)(1)(a)(2)(a). She fails to present specific medical findings to satisfy this listing and presents only conclusory statements. Therefore, the undersigned will only consider whether Claimant's impairments functionally equal the listing and consider Plaintiff's arguments concerning the opinion evidence of Dr. Sandra Sommers and Dr. Kelly Wadeson.

### A.    Dr. Sandra Sommers' Opinion

With regard to Dr. Sommers' opinion, Plaintiff alleges that the ALJ failed to fully address Dr. Sommers' opinion that Claimant was extremely limited in the domain of Acquiring and Using Information and failed to provide a meaningful analysis in this domain . ECF Dkt. #13 at 13. First, Plaintiff states that in the ALJ's finding that her opinion was inconsistent with the evidence and assigning it little weight, the ALJ provided examples that pertained more to the domains of Attending and Completing Tasks and Caring for Self than those relevant to Claimant's cognitive deficits. *Id.* To this point, Plaintiff concludes that the basis for discrediting Dr. Sommers' opinion with regard to Claimant's limitations in the domain of Acquiring and Using Information lacks relevance. *Id.* Plaintiff's second contention is that the ALJ's conclusion that Dr. Sommers' opinion was inconsistent with the record was in error because it was consistent with (1) Dr. Sommers' own prior evaluation; (2) the assessments and interventions of speech and occupational therapists; (3) the IEP assessment; and (4) a questionnaire from teacher Monica Marolt. *Id.* at 13-17.

15

Keeping in mind the proper standard on review, the undersigned recommends that the Court find that the ALJ applied the proper legal standard in this case and substantial evidence supports his determination. Even if substantial evidence exists to the contrary, this Court must affirm the ALJ's decision if substantial evidence exists to support it.

In his decision, the ALJ considered Dr. Sommers' opinion, which is stated in the Questionnaire on Medical and Functional Equivalence, dated August 22, 2016. Tr. at 45-46; *see* Tr. at 449-53. In this questionnaire, Dr. Sommers indicated she has known Claimant since November 24, 2014. *Id.* at 450. The ALJ took note of Dr. Sommers' findings that Claimant has: extreme limitation in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Moving About and Manipulating Objects; marked limitation in the domains of Caring for Self and Health and Physical Well-Being; and moderate limitation in the domain of Interacting and Relating with Others. *Id.* at 45 (citing Tr. at 450-52). The ALJ further considered that Dr. Sommers noted that the Claimant has a cognitive delay, along with ADHD, which results in severe learning problems, has extensive accommodations in her school setting, needs Speech Therapy and OT, and that her condition is long-term although the Claimant has not had any problems with school attendance. *Id.* (citing Tr. at 452).

The ALJ found that Dr. Sommers' opinion regarding extreme limitations is inconsistent with progress notes, teacher questionnaires, and testimony at the hearing. Tr. at 45. The ALJ then gave an example in which Dr. Sommers opined extreme limitation in the domain of moving about and manipulating objects despite Claimant being able to walk, jump, and run without difficulty, play basketball on a team, play with her hula hoop, play tag, ride her bike, play with dolls, color, play video games, manage activities of daily living age-appropriately, keep up with peers, and participate in other extracurricular activities. *Id.* (citing Tr. at 117, 225, 227, 231, 233, 344, 411, 419, 468, 493).

The ALJ then explained specific inconsistencies he found regarding Dr. Sommers' opinions for each of the domains. The ALJ found that extreme limitation in the domains of Acquiring and Using Information and Attending and Completing Tasks was inconsistent with the record that demonstrated that Claimant improved with Speech and OT sessions, was able to work on directed activities, showed good attention, focused more, completed various tasks and games, and performed

16

household chores and activities of daily living age-appropriately. *Id.* at 45-46 (citing Tr. at 225-26, 231-32, 401, 434-35, 439, 491, 493, 501, 521, 524). The ALJ also found that marked limitation in the domains of Caring for Self and Health and Well-Being was inconsistent with unremarkable physical examinations and that the Claimant exhibited age-appropriate hygiene and self-care, managed her activities of daily living age-appropriately, and had "excellent" attendance at school. *Id.* at 46 (citing Tr. at 225, 231, 271-72, 401-02, 418, 424, 430-31, 439-40, 460, 468, 493). Finally, the ALJ found that even moderate limitation in the domain of Interacting and Relating with Others was inconsistent with the record, which showed that the Claimant had no behavioral problems at school, at home, or in public, maintained good relationships with others, participated in activities, and presented as friendly, quiet, helpful, respectful, attentive, compliant, interactive, pleasant, and cooperative. *Id.* (citing Tr. at 177, 225-26, 228, 231-34, 239, 272, 455, 484, 489, 496-524).

The undersigned recommends that the Court find no merit to Plaintiff's first contention that the ALJ did not provide relevant examples in the domain of Acquiring and Using Information in his discussion of Dr. Sommers' opinion. The ALJ specifically discussed why Dr. Sommers' opinion was inconsistent with the record and, with respect to this particular domain, he cited specific examples for support. Tr. at 45-46. The relevant examples the ALJ listed included Claimant's reported improvement in Speech and OT sessions, her ability to work on directed activities, showing good attention, focusing more, completing various tasks and games, and performing household chores and activities of daily living in an age-appropriate manner. *Id.* These examples relate to Claimant's abilities in school settings and in daily living situations and her ability to understand, respond to, and share information. *See* 20 C.F.R. § 416.926a(g)(iv) (generally describing what school-age children should be able to do).

Regarding Plaintiff's second contention that there were other records that were consistent with Dr. Sommers' opinion, the undersigned recommends that the Court find this assertion is also without merit. To support her contention, Plaintiff points to four separate sources from the record to show that Dr. Sommers' opinion is consistent with the record, contrary to the ALJ's conclusion.

First, Plaintiff relies on the fact that Dr. Sommers' opinion is consistent with her own earlier assessment of Claimant. ECF Dkt. #13 at 13-14. Dr. Sommers evaluated Claimant on March 25,

2015 and later filled out a Questionnaire on Medical and Functional Equivalence on August 22, 2016. Tr. at 310-21, 449-53. Dr. Sommers marked Claimant as having an "extreme" limitation in the domain of Acquiring and Using Information. *Id.* at 450. The questionnaire defined a "marked" limitation as a limitation that "[i]nterferes seriously with the child's ability to function independently, appropriately, and effectively in an age appropriate manner," and testing is usually two standard deviations below the mean. *Id.* It defined an "extreme" limitation as a claimant having "[n]o meaningful function in a given area," and testing is usually three standard deviations below the mean. *Id.* These definitions coincide with the definitions in 20 C.F.R. § 416.926a(e)(2)(i) & (e)(3)(i), which defines a "marked" limitation as typically exhibiting standardized test scores "that are at least two, but less than three, standard deviations below the mean," and an "extreme" limitation as exhibiting standardized test scores "that are at least three standard deviations below the mean."

Dr. Sommers administered the WISC-V and WIAT-III tests to Claimant to test her general intellectual functioning and academic achievement. Tr. at 311, 314, 316-17. Claimant's scores on the WISC-V all fell within three standard deviations of the mean. Specifically, Claimant's score for Processing Speed was within one standard deviation of the mean; Verbal Comprehension, Visual Spatial, Fluid Reasoning, and Full Scale IQ scores all fell within two standard deviations of the mean; and Working Memory fell within three standard deviations of the mean. *Id.* at 314. Claimant's scores on the WIAT-III all fell within three standard deviations of the mean, except for one. *Id.* at 316-17. Claimant's only score that fell over three standard deviations of the mean was on Early Reading Skills. *Id.* at 317. Dr. Sommers also noted in her evaluation that given Claimant's difficulty with distractibility, "it is highly likely that the intellectual results are in the lower range of her abilities, which should be taken into consideration when reading the results." *Id.* at 314. Dr. Sommers' own standardized testing of Claimant's general intellectual functioning and academic achievement generally show standard deviations that were well within three standard deviations of the mean, which would more accurately correspond to a "marked," rather than "extreme," limitation in the domain of Acquiring and Using Information.

Moreover, test scores alone do not determine whether a claimant has a "marked" or "extreme" limitation. *See* 20 C.F.R. § 416.926a(e)(4)(i); Tr. at 450. A claimant's day-to-day

activities and other information about functioning are also relevant to consider in determining the type of limitation. *See* 20 C.F.R. § 416.926a(e)(4)(ii). In addition to the test results, Dr. Sommers' 2015 evaluation included basic background information about Claimant and Dr. Sommers' own observations of Claimant. Tr. at 311-14. Dr. Sommers observed that Claimant was "highly distracted and had significant problems with sustained attention," which "affected her ability to hear and comprehend instructions and to complete tasks." *Id.* at 312. Dr. Sommers noted that Claimant requires visual/hands-on approaches when learning new skills and requires a great deal of repetition to comprehend and retain new information. *Id.* at 318. She concluded that Claimant's "intellectual delay, along with her significant difficulty with compromised sustained attention, result in a young girl who has an almost impossible time comprehending and retaining information." *Id.* at 319. Throughout her evaluation, Dr. Sommers also considered Claimant's ADHD and difficulty with distractibility. *Id.* at 311-14, 318-20. In her recommendations, Dr. Sommers stated:

> [Claimant's] ADHD symptoms are part of the significant interference to her ability to learn. It will be important for her parents to work with her pediatrician to determine what medical interventions will be most successful with increasing her sustained attention. If [Claimant] is able to focus and pay attention, it significantly increases her ability to absorb the information that she is hearing.

*Id.* at 320.

The questionnaire Dr. Sommers filled out only shows that she marked Claimant as having an "extreme limitation" in the domain of Acquiring and Using Information, but it does not provide the reasons why she marked it in that way. The test scores alone correspond more closely to a "marked" limitation; however, Dr. Sommers may have relied more heavily on other information in her evaluation to conclude Claimant has an extreme limitation. Her notes indicated that Claimant had serious difficulty learning and using information, but her conclusion that Claimant could improve those skills with proper medication is inconsistent with an extreme limitation in which a claimant would have "no meaningful function in a given area." *See* Tr. at 450. Therefore, the undersigned finds that Dr. Sommers' 2016 opinion is only somewhat consistent with her 2015 evaluation.

Second, Plaintiff argues Dr. Sommers' opinion is consistent with the assessments and interventions of speech and occupational therapists. Plaintiff points out that the ALJ repeatedly

mentioned improvement with Speech and OT services, but he failed to mention that there remained an ongoing need due to the lack of progress. ECF Dkt. #13 at 15 (citing Tr. at 494). She contends that the significant improvements the ALJ relied on pertain only to visual processing and that he failed to mention that, despite her progress, her overall visual perception quotient continued to be below average. *Id.* at 15-16 (citing Tr. at 43-44, 491, 493).

Dr. Sommers opined in her March 25, 2015 evaluation of Claimant that Claimant's visual motor coordination was of significant concern because she had delayed fine motor skills. Tr. at 319. These results indicated that her visual eye-hand coordination was approximately three years behind her expected age range. *Id.* On September 14, 2015, Claimant presented for her initial OT evaluation to Angela Rice, who concluded that Claimant demonstrated visual motor skills below typical ranges, which likely interfered with her ability to participate in age appropriate functional activities. *Id.* at 330. Ms. Rice also noted that Claimant had delays with self help skills because Claimant could not tie her own shoes and needed assistance with some fasteners. *Id.* at 330-31. Ms. Rice found that Claimant would benefit from OT services to address the concerns regarding her visual motor skills. *Id.* at 331. One year later, on October 11, 2016, Ms. Rice evaluated Claimant again and found that, overall, Claimant showed significant improvement in visual processing since her prior evaluation. *Id.* at 491. Ms. Rice noted that Claimant's overall visual perception quotient continued to be below average, her visual motor integration was average, and motor free visual perception was "poor." *Id.* Ms. Rice recommended for Claimant to continue working on motor free visual perception. *Id.*

The ALJ considered Claimant's aforementioned OT evaluations and discussed her progress over time with treatment. Tr. at 43-44. The ALJ also discussed subsequent OT visits from April 25, 2016 to May 23, 2017 and her gradual, continued improvement. *Id.* at 44. He noted that Claimant demonstrated good use of strategies learned in previous sessions, recalled 4/5 then 5/5 words without prompting, handled objects easily and successfully, continued to improve and exhibit good attention, showed increased tolerance for intensive testing, finished testing in much less time, needed far fewer instances of redirection during testing. *Id.* (citing Tr. at 432, 434-36, 491, 494, 501). The ALJ further described how Claimant routinely presented as alert, attentive, compliant, interactive, and motivated. *Id.* (citing Tr. at 434-35, 489, 496-524). He noted that Claimant was able to perform activities of

daily living in an age appropriate manner and could dress independently with increased time. *Id.* (citing Tr. at 493).  Specifically during her visits in May 2017, the ALJ found that Claimant was about to work on all therapist directed activities with minimal reminders, demonstrated good attention, completed various handwriting and iPad based games, and worked for 30 minutes on structured tasks without a break. *Id.* (citing Tr. at 521, 524).

Dr. Sommers' initial evaluation of March 2015 was consistent with earlier OT visits that were made around the same time period, which was mid- to late-2015. Claimant continued to attend OT sessions and the records reflect improvements in the specific area relating to Claimant's visual motor development. However, Dr. Sommers' questionnaire and opinion from August 2016 is not consistent with Ms. Rice's October 11, 2016 OT evaluation. *See* Tr. at 451, 491. For example, in the questionnaire, Dr. Sommers' marked Claimant as having an "extreme" limitation in the domain of Moving About and Manipulating Objects, which means that Claimant has no meaningful function in that area. *Id.* at 450-51; *see* 20 C.F.R. § 416.926a(j)(1)(iii)(this domain assesses actions which "require a sense of where your body is and how it moves in space; the integration of sensory input with motor output; and the capacity to plan, remember, and execute controlled motor movements."). However, around this same time, Ms. Rice evaluated Claimant and found that she showed significant improvement in visual processing skills since her initial evaluation from one year prior. *Id.* at 490-91(Claimant's results are from the DTVP-2, which assesses perception and visual-motor integration skills in children). Ms. Rice found that Claimant's scores improved from the "below average" and "very poor" categories to the "below average" and "average" categories after the course of one year. *Id.* Therefore, the undersigned finds that Dr. Sommers' opinion was consistent with the earlier OT visits from 2015, but it was not consistent with the later 2016 OT assessment from Ms. Rice. Dr. Sommers did not re-evaluate Claimant in 2016 and her opinion did not reflect Claimant's improvements, but rather appeared to rely solely on her own evaluation from one year prior.

Third, Plaintiff concludes that Dr. Sommers' opinion is consistent with the IEP assessment from January 12, 2016. ECF Dkt. #13 at 13. However, instead of expanding on this argument, Plaintiff then argues in her merits brief that the IEP evaluation was consistent with Dr. Wadeson's February 2017 neuropsychological evaluation. ECF Dkt. #13 at 16-17. Plaintiff's conclusory

statements that Dr. Sommers' opinion is consistent with the IEP assessment, without more, is deemed waived because she has failed to make a substantive argument on this point. Plaintiff's discussion concerning the IEP's consistency with Dr. Wadeson's opinion will be discussed later.

Finally, Plaintiff discusses a February 18, 2016 questionnaire from Claimant's Second Grade teacher, Monica Marolt. ECF Dkt. #13 at 14. Plaintiff does not explicitly state how Ms. Marolt's questionnaire supports any of her arguments, but presumably it is to show that it is consistent with Dr. Sommers' opinion. Ms. Marolt indicated that Claimant has problems functioning in the domain of Attending and Completing Tasks but observed no problems in the domain of Moving About and Manipulating Objects. Tr. at 410-11. However, Dr. Sommers opined that Claimant has an extreme limitation in both of those domains. *Id.* at 451. Therefore, the undersigned finds an inconsistency between Ms. Marolt's questionnaire and Dr. Sommers' opinion.

### B.      Dr. Kelly Wadeson's Opinion Evidence

Plaintiff makes two points about Dr. Wadeson's opinion. First, Plaintiff discusses Dr. Wadeson's evaluation and argues that her testing was largely ignored by the ALJ. ECF Dkt. #13 at 13-15. Plaintiff also states that the ALJ's analysis failed to provide any insight into his evaluation of Dr. Wadeson's opinion and his failure to address Dr. Wadeson's assessment and opinion cannot be considered part of a meaningful analysis. Second, Plaintiff mentions Dr. Wadeson's evaluation alongside the IEP assessment dated January 12, 2016. ECF Dkt. #13 at 16-17; *see* Tr. at 175-97, 343-55. Plaintiff fails to clearly state the reason she is comparing the IEP assessment and Dr. Wadeson's evaluation, but the undersigned will presume it is to show consistency in the record since that is the main argument made with regard to Dr. Sommers' opinion.

In the ALJ's decision, he discussed Dr. Wadeson's February 2017 evaluation, finding that it indicated improvement but also noted that Claimant still showed limitations. Tr. at 44. However, the ALJ found that her report was based on a single evaluation. *Id.* He noted that Dr. Wadeson indicated that despite Claimant's signs of considerable improvement and progress with areas addressed by OT, particularly in the area of visual perceptual skills, she seemed to have not progressed in terms of academics. *Id.* (citing Tr. at 483-84, 486). The ALJ also remarked that the

evaluation showed that Claimant's ability to retain educational information appeared quite limited, and she seems to quickly forget information taught. *Id.* (citing Tr. at 484). He further mentioned that the evaluation noted that Claimant showed signs of hyperactivity but was well behaved, fights with her sister but then they apologize and play together, she does well with children her own age and younger, she listens and cooperates at school, works hard, and likes to receive feedback and encouragement. *Id.* He further noted that the evaluation indicated that the effectiveness of Claimant's prescribed Focalin was questionable, although the Claimant reportedly had not taken medication for many months. *Id.* The ALJ considered Dr. Wadeson's observations that Claimant appeared nicely dressed and neatly groomed, made good eye contact, was easy to engage, had a euthymic mood, had appropriate effect, separated easily from her mother, exhibited normal speech but spoke little and seemed to have limited vocabulary, and showed impaired comprehension, distractibility, and impulsiveness on some tasks. *Id.* (citing Tr. at 484). He also noted her observation that Claimant was able to complete full testing and had good frustration tolerance, even when things became increasingly difficult. *Id.* (citing Tr. at 484-85). The ALJ concluded that, overall, the results of Dr. Wadeson's evaluation were consistent with previous assessments and supported continued eligibility for special educational services as well as speech and OT. *Id.* at 44-45 (citing Tr. at 486-87).

In the section of the ALJ's opinion about the domain of Acquiring and Using Information, the ALJ specifically considered Dr. Wadeson's evaluation of Claimant. Tr. at 47-48. He stated: "[Dr. Wadeson's] single evaluation indicated that the claimant has limited ability to retain educational information and quickly forgets what has been taught." *Id.* at 48 (citing Tr. at 484). Throughout his decision, the ALJ referred to Dr. Wadeson as the "neuropsychologist," rather than by name, but his citations and obvious references are to Dr. Wadeson's evaluation. Therefore, the undersigned finds that Plaintiff's contention that the ALJ failed to address Dr. Wadeson's assessment or give any insight is without merit.

Regarding Plaintiff's comparison of the IEP evaluation and Dr. Wadeson's evaluation, the undersigned finds that this point is moot. The ALJ explicitly stated that the results of Dr. Wadeson's evaluation were consistent with previous assessments, and he also considered her opinion in his analysis concerning the domain of Acquiring and Using Information. Tr. at 44-45, 48.

23

For the reasons stated above, the undersigned recommends that this Court find that the ALJ applied the correct legal standard and substantial evidence supports it.

## VIII.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and dismiss the instant case in its entirety with prejudice.

Date: June 27, 2019                             */s/George J. Limbert*
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).